## Giorgianni, Appellant, *v.* DiSanzo.

Argued March 18, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*T. Robert Brennan,* with him *Maurice Chaitkin, Edward A. Damrau,* and *Brennan and Brennan, Damrau & Mohan,* for appellant.

*William C. Walker,* with him *Dickie, McCamey, Chilcote & Robinson,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY:

In this action in trespass there was a jury verdict for the defendant. Following denial of plaintiff's motion for a new trial, judgment was entered on the verdict, and plaintiff has appealed therefrom, assigning error in the court's charge to the jury.

The plaintiff, Miss Giorgianni, a Miss Garbin and a Miss Zajackowski, young women residing in and employed in the City of Pittsburgh, arranged with the defendant, Miss DiSanzo,[1] who resided in the Borough of Freedom, Beaver County, to spend the week-end together. The first three mentioned members of the party left Pittsburgh by train at about 7:30 P.M. on Saturday evening, October 24, 1953 and arrived about an hour later at Rochester, Pennsylvania where they were met by the defendant, Miss DiSanzo, who owned and was operating her automobile. After stopping at

---

[1] Miss DiSanzo married prior to the trial and was also referred to in the testimony as Mrs. Denney.

a hotel in Rochester where some of them had dinner, they drove to the Sons of Italy Club in Elwood City, arriving there about 10:45 P.M., where they danced and had some drinks and some pizza pie. They left this club at about 2:30 A.M. (October 25th) and proceeded to the Moose Club where they stayed about a half hour. Defendant, Miss DiSanzo, entered this club but after a few minutes returned to her car and listened to the radio. After leaving the Moose Club at about 3 A.M., the three members of the party joined Miss DiSanzo in her car and all proceeded toward Beaver Falls where it was their intention to spend the night at the Broadhead Hotel. The plaintiff was seated in the rear seat back of Miss DiSanzo, the driver. Miss Zajackowski sat in the rear to plaintiff's right, and Miss Garbin sat in the front seat beside the driver. On the journey to Beaver Falls their route passed through the Borough of Koppel. Before reaching Koppel they had been travelling on a curving two-lane highway. There was a car in front of them occupied by a couple, which was moving from one side of the road to the other. After crossing a toll bridge and entering Koppel they reached a four-lane paved highway, known as Fifth Avenue. There was no other traffic on the street in Koppel at that hour in the morning and the defendant drove past the car which had been in front of them, before reaching an intersecting highway known as Walnut Street. At this intersection there were two depressions in the paving extending across Fifth Avenue at approximately the curb lines of Walnut Street. These rounded depressions were apparently for drainage purposes, and there was testimony by an investigator employed by plaintiff's counsel that the bottom of each depression varied in depth from 8 inches in the middle of Fifth Avenue to 5 inches toward the boundaries of the avenue. When the car which the defendant was driving

and in which the other three persons were passengers went over each of these depressions there was a bump which caused the head of the plaintiff to strike the top of the car and, according to her testimony, she was thrown to the floor. Miss Zajackowski called to the defendant to stop, and the latter drove her car to a stop on the right-hand side of the street. Plaintiff complained of pain but resumed her seat and the car continued its journey to Beaver Falls where the party spent the remainder of the night. In the morning they attended church and in the afternoon the defendant drove the others to her home in Freedom and later took them to the train for Pittsburgh. Upon plaintiff's return to Pittsburgh X-rays revealed that she had suffered a fracture of the first lumbar vertebra, causing damages which the plaintiff sought to recover in this suit.

Appellant's contentions are: (1) that the court's charge as to negligence was inadequate; and (2) that the court emphasized and wrongfully submitted an issue of contributory negligence which did not exist. We find no merit in either contention.

As to the issue of negligence, the trial judge charged as follows: "Now, the plaintiff in this case is charging the defendant, Miss DiSanzo or Mrs. Denney, with negligence. She says that Miss DiSanzo—we'll call her that because that is what she was known to us throughout most of the case—did not operate her automobile on this occasion in as careful a manner as a reasonably, prudent person should have operated that automobile, under all of the circumstances that existed here. If Miss DiSanzo did operate her automobile as a reasonably, prudent person would have been expected to do under these circumstances, then there is no right of action here. There is no case for the plaintiff and your verdict should be for the defendant.

"We then go into the evidence to inquire as to what is the main question here, and practically the only question on liability is whether Miss DiSanzo was operating her automobile as a reasonably, prudent person would have been expected to do at this time and under all of the conditions that prevailed. That is the issue for you to determine and as I said, the charge here is that there was negligence; that that was the immediate cause of this action. If there was no negligence, then there is no case here."

Thereafter the judge reviewed at considerable length the testimony of all of the witnesses, referring to the testimony as to the speed at which the defendant was driving, the depressions in the street, the visibility and other conditions surrounding the happening; and again toward the conclusion of his charge said: "Was then Miss DiSanzo driving her car as a reasonably, prudent person would? There was no collision here with anybody else, according to the testimony. There was no other car in sight but the car that they had just passed, and which we have described. Did she or should she have seen these bumps which were in the street? The car was at all times, as I understand it, on a public thoroughfare in this village. It didn't get off the street or the paved part of the street, but there was a drainage depression or two drainage depressions which a witness has described here, he said he went and measured them later on as to what their depth really was. Miss DiSanzo said that she didn't see those bumps on this night. It had been raining, the roads were wet and as I say, it was three a.m. There were street-lights that were lit or shining in the town at that time and the headlights of the automobile were on."

There was testimony to the effect that glare from the street lighting prevented the depressions from be-

ing seen on the wet road. The defendant testified that the appearance of the street was deceptive and she didn't see the bumps before the car went over them. As to speed defendant testified that the car she was following on the narrow portion of the route was travelling only 15 or 20 miles per hour and that when she passed it in the borough and entered the intersection she was travelling between 25 and 30 miles per hour. Miss Garbin, called by the plaintiff, estimated the defendant's speed at 45 or 50 miles per hour when they entered the intersection and 35 miles per hour prior thereto. This was one of the few points in dispute on the question of liability and the verdict establishes that the jury accepted the defendant's version. Appellant does not contend that the verdict was against the evidence or weight of the evidence.

Appellant cites The Vehicle Code, Act of May 1, 1929, P. L. 905, Article 10, §1002, as amended, 75 PS §501, which places a speed limit of 20 miles per hour on all vehicles when approaching within 50 feet and in traversing an intersection of highways within a business or residence district *when the driver's view is obstructed.* As stated by the court below, the undisputed evidence in the instant case is that there was no obstruction of the defendant's view. According to all of the evidence she had completed passing the other car which was in the curb lane before she reached the intersection, and in the driver's seat of course could see ahead before her car had completely passed the other car. Plaintiff did not establish that the defendant's view was obstructed within 50 feet of the intersection. Moreover if plaintiff's counsel desired the court to amplify its charge in this regard, he should have so requested, especially since the court specifically at the conclusion of his charge addressed counsel, inquiring, ". . . what have I omitted or misstated or

should correct?". Counsel for plaintiff made several suggestions or requests with which the court complied, none of which complained of inadequacy of the judge's charge on the issue of negligence. An appellate court will not grant a new trial on the ground of inadequacy in the charge unless there is omission of something basic or fundamental, especially where the complaining party was invited to suggest additions to the charge and remained silent. See *Finnerty v. Darby,* 391 Pa. 300, 138 A. 2d 117, and cases cited therein.

Turning to appellant's second contention, we cannot say that the court erred in charging on the subject of contributory negligence nor that he unduly emphasized this issue. As before stated, there was testimony, if believed, by Miss Garbin who estimated the defendant's speed as 45 or 50 miles an hour as they entered the intersection and that she was "concerned", although she did not remonstrate. The question, therefore, was whether or not the plaintiff should have remonstrated and the court properly charged as to the plaintiff's duty of care in this regard. Plaintiff testified that she was "snoozing", but under all the circumstances the jury could have disbelieved her. Moreover, a sufficient answer to this contention is that the court directed the jury to *first* ascertain whether there was negligence on the defendant's part and then if they found the defendant negligent they would consider the matter of whether the plaintiff exercised the care which she was called upon to exercise as a reasonably prudent person under the circumstances. The jury specifically found the defendant free of negligence, their verdict being: ". . . we, the Jurors empanelled in the above entitled case, find Esther E. DiSanzo not guilty of Negligence.[2] . . ."

---

[2] The court molded this verdict by adding to the verdict as rendered: ". . . and find a Verdict in favor of Defendant."

We find no reversible error in this case, and a reading of the record persuades us that the jury rendered a proper verdict.

OPINION PER CURIAM, May 2, 1958:

The foregoing opinion, written by Mr. Justice CHIDSEY prior to his death on April 19, 1958, is adopted and filed as the opinion of the Court.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

At the end of the Court's charge to the jury in this case the Trial Judge asked plaintiff's counsel: "Mr. Brennan, what have I omitted or misstated or should be corrected?" The jury brought in a verdict for the defendant and the plaintiff has appealed for a new trial, complaining that the charge of the Court was inadequate and misleading. This Court has refused a new trial asserting that if there was anything inadequate and misleading in the charge, plaintiff's counsel should have so indicated when asked about it, and that his failure to do so precludes him now from bringing up the subject again.

The Majority seems to be of the impression that the question put by the Trial Judge to plaintiff's counsel acted like magic and that it brought perfection to what was imperfection, that it supplied substance for what was missing, and that it provided clarification for what was ambiguous. The Majority Opinion says that a new trial will not be granted "where the complaining party was invited to suggest additions to the charge and remained silent."

I fail to see the justice or logic of such a ruling. For a judge to ask counsel if he has omitted anything, or if he has misstated anything, or if he has made any

error which should be corrected is like a school teacher asking her pupils at the end of a lesson of instruction if she has made any mistakes, if she mispronounced words, if she employed the wrong phraseology, and if she perhaps used the wrong book. Who should know better than the teacher what the correct lesson should be? And who should know better than the judge what the law is?

The slightest suggestion of a suspicion seems to whisper into my ear that *some* judges ask questions similar to the one quoted above, not for the purpose of being corrected but for the purpose of assuring themselves that they may now sleep without a corrugating care, in the awareness that if they blundered in charging the jury there will be but little chance of reversal because the appellate court will say that the judge very magnanimously invited the lawyer to make corrections, to offer additions, and to recommend alterations but that the lawyer failed to take advantage of such magnanimity. On the contrary the lawyer remained silent, that is, he sat by, taking a chance on the verdict, and that he may not, therefore, now complain, etc, etc.[1]

It might be interesting to inquire in this case why the Trial Judge asked for corrections *only* of the plain-

---

[1] This is invariably true, even though this Court said in the case of *Patterson v. Pittsburgh Rys. Co.*, 322 Pa. 125, 128: "It is true defendant took only a general exception to the charge, but where, as here, the case calls loudly for such instructions, the failure to give them must be regarded as basic and fundamental error. Inadequacy of a charge may be taken advantage of on general exception where the instructions omitted are vital to a proper conception by the jury of the fundamental principles of law involved (DiPietro v. Great Atlantic & Pacific Tea Co., 315 Pa. 209), and the inadequacy is just as basic where, in a case like the present, the legally established methods of determining the factual question involved are not explained to the jury."

tiff's attorney. Was there no possibility that he might have erred in presenting the defendant's case? And of what use was the question put to plaintiff's counsel anyway? It can happen and it does happen, and it was true in this case, that the error may be of such a character that even a correction or explanation will not cure the defect. In such a situation the indicated question may be likened to a cowcatcher on a locomotive travelling backwards. Such a cowcatcher can do little to sweep from the track what has *already* wrecked the train.

The fault in the Trial Judge's charge here was not simply a matter of misstatement or one of omission. It was a continuing error. For the Judge to have corrected his mistake would have necessitated his charging the jury practically de novo. The defect in the charge lay in the fact that the Judge failed to weave into his instructions the law of negligence as it applied to the particular circumstances of the case. In *Hess v. Mumma,* 136 Pa. Superior Ct. 58, 65, the Superior Court reversed where the Trial Judge failed to integrate the law and the testimony: "We think that the instructions were too meager to supply the jury with the proper legal method for determining the issues of negligence and contributory negligence. True, the trial judge defined those terms, but *he did not give the jury any guide for applying them to the facts of the case,* as they might be found by the jury. The jury should have been informed what conduct on the part of defendant would, under the evidence, have constituted negligence . . ." At least in the *Hess* case the Trial Judge defined the term of negligence. Here, nothing.

The learned Trial Judge said to the jury: "Now, the plaintiff in this case is charging the defendant, Miss DiSanzo . . . with negligence. She says that Miss DiSanzo . . . did not operate her automobile on this occasion in

as careful a manner as a reasonably, prudent person should have operated that automobile, under all of the circumstances that existed here. If Miss DiSanzo did operate her automobile as a reasonably, prudent person would have been expected to do under these circumstances, then there is no right of action here. There is no case for the plaintiff and your verdict should be for the defendant."

It would not be very helpful to the master of a ship traversing an unknown sea to be supplied with geographical and meteorological data but to be denied the use of a compass. Nowhere in the charge did the Trial Judge explain how a reasonably prudent person should have operated the car "under these circumstances." Nowhere did the Trial Judge tell the jury just what, objectively, could have been regarded as negligence on the part of the defendant. Jurors cannot take an abstract principle of law and stand it up, like a measuring rod, against a pyramid of evidence and determine, from the point at which the rod ends, whether negligence has or has not been made out.

A jury which is hungry for instruction on how to discharge its duty properly is left with its appetite singularly unsatisfied merely to be told: "Practically the only question on liability is whether Miss DiSanzo was operating her automobile as a reasonably, prudent person would have been expected to do at this time and under all of the conditions that prevailed." The jury might have wanted to know what a "reasonably prudent person" does or does not do. They would certainly have welcomed a description of this mythical personage who, in the words of Horace, stalks through all our decisions "complete in himself, polished and well-rounded."

The record shows that the defendant could have been found guilty of negligence in ignoring the hazard

of driving at an excessive speed over a wet pavement in the rain, of driving pell-mell over a pavement beset with drainage sewers and depressed surfaces, or of continuing to drive recklessly after having been apprised of a dangerous situation in the highway. There is nothing in the charge which would enlighten the jury on the standard of care they should apply in considering the defendant's actions as she drove under the conditions testified to. In fact, in the whole charge one does not even find a definition of negligence!

The Majority Opinion, in affirming the refusal of a new trial, does not analyze the Trial Judge's charge, but does devote considerable space to narrating what the plaintiff, the defendant, and the other two car passengers did before they even got to the car. The Majority Opinion informs us how these four people decided to spend a weekend together, how three of them travelled by train from Pittsburgh to Rochester, how the four of them had dinner at a hotel in Rochester, how they drove to the Sons of Italy Club in Ellwood City where they danced and consumed drinks and pizza pie. I find this narrative very interesting and I would like to tarry at the pizza pie counter, but I would have been more enlightened on the reasons as to why the Majority believes that the Trial Judge's charge was perfect if the Majority had lingered a moment or two on the fact that *the Judge in a negligence case failed to define negligence!*

While the Trial Judge did not believe it important in a negligence case to define negligence he did find time to expatiate on the subject of contributory negligence. He instructed the jury that if they found that the plaintiff, Frances Giorgianni, failed to warn the defendant to reduce the speed of her car, Miss Giorgianni would be guilty of contributory negligence and could not recover. Miss Giorgianni testified that be-

fore and at the time of the happening of the accident she was snoozing on the rear seat of the car. No one disputed this statement. The Trial Judge, however, made no reference to the snoozing evidence in his charge, although it must be apparent that if Miss Giorgianni was snoozing she could not have been aware of the speed of the automobile and would not have been conscious enough to warn the driver about any speed. The Majority Opinion finds nothing wrong about the Trial Judge's failure to mention the plaintiff's snoozing, and explains that perhaps the jury did not believe the plaintiff when she said she was snoozing.

The most casual reading of the Court's charge in this case will reveal it to be so deficient, insofar as the law of negligence is concerned, that I do not doubt that law students studying it may well denominate it the "snoozing case."